**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JOHN DOE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 05 C 5189** |
| | ) | |
| **BOARD OF TRUSTEES OF THE** | ) | |
| **UNIVERSITY OF ILLINOIS, JENNIFER** | ) | |
| **BLOOM, JAMES SLAUCH, KIM** | ) | |
| **SCHUTTERLE, LEIGH SAINT-LOUIS,** | ) | |
| **BRADFORD SCHWARTZ, DIXIE WHITT,** | ) | |
| **RICHARD GUMPORT, WILLIAM** | ) | |
| **MARSHALL, DOUGLAS RHONE, and** | ) | |
| **UMA SEKAR,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

John Doe, a former M.D./Ph.D. student at the University of Illinois, has sued the

University, several of its officials, two fellow students, and two clinical faculty employed by the

federal Department of Veterans Affairs for violations of his federal and state rights. All of the

defendants – except the two employed by the Department of Veterans Affairs – have moved to

dismiss all of Doe's claims. For the reasons stated below, the Court grants the motion in part and

denies it in part.

### Facts

From the fall of 1999 through the spring of 2004, plaintiff John Doe was enrolled as a

M.D./Ph.D. student at the University of Illinois's Urbana campus. Doe suffers from learning

disabilities that affect his visual perception and writing abilities. Nonetheless, he was able to obtain a bachelor's degree in philosophy at a prestigious American university, complete pre-medical courses at that university and another university, and attain high scores on the MCAT examination. In 1999, the University of Illinois admitted Doe to the College of Medicine's Medical Scholars Program, a program that enables a student to pursue M.D. and Ph.D. degrees simultaneously. Doe planned to obtain an M.D. degree and a Ph.D. in philosophy. Compl. ¶¶ 17-23.

During the 1999-2000 school year, Doe took only philosophy courses, earning As, A-minuses, and one B-plus. During the 2000-2001 school year, Doe took the full set of first year medical courses. He also worked as teacher's assistant both semesters. Doe failed Histology Lab, Immunology Lab, and Physiology, and he was required to retake the entire first-year medical school curriculum. *Id.* ¶¶ 24-26, 29.

On October 29, 2001, Doe obtained an extensive evaluation of his learning disabilities at the request of the College of Medicine. Dr. Neil Pliskin, a psychiatrist specializing in neuropsychology, who was employed at the Chicago campus of the College of Medicine, confirmed that Doe had visual perception problems and dysgraphia. Dr. Pliskin recommended that Doe be allowed to take tests orally whenever possible; complete any written assignments, tutorial lessons, and drill-and-practice work on a computer; use adaptive devices designed for those with visual impairments; tape record class lectures; and have extended time to complete assignments and examinations. The College of Medicine extended Doe's examination time but did not implement any of Dr. Pliskin's other recommendations. During the 2001-2002 school year, Doe successfully completed the first-year medical school curriculum, a philosophy

independent study, and a philosophy seminar while working as a teaching assistant in the philosophy department. *Id*. ¶¶ 27-28, 30.

In November 2002, Doe met with James Slauch, the director of the Medical Scholars program, to develop a plan to complete his M.D. and Ph.D. studies successfully. During this meeting, Doe and Slauch agreed that Doe would defer any further work on the Ph.D. until he completed the M.D. At the time, the chairman of the department of philosophy, the director of graduate studies for the department, and Doe's graduate advisor agreed to the plan. *Id*. ¶¶ 32-33. Doe's complaint does not discuss Doe's academic performance during the 2002-2003 school year.

At a Medical Scholars annual progress conference in May 2003, both Slauch and Jennifer Bloom, the associate dean of students for the College of Medicine's Urbana campus, criticized Doe regarding his progress in the program and disavowed the plan that Slauch and Doe had developed six months earlier. Slauch demanded that Doe attend a meeting to discuss eliminating the plan. Doe subsequently sent a written complaint to Bradford Schwartz, the regional dean for the College of Medicine's Urbana campus, regarding Bloom and Slauch's behavior. Doe also sent Bloom and Slauch copies of the complaint. *Id*. ¶¶ 35-36. Doe's complaint in this action does not state whether he ever had a second meeting with Slauch.

During the fall of 2003, Doe successfully completed the first semester of the second-year medical school curriculum. In December 2003, he received a letter from Slauch, who stated that Doe would not be allowed to proceed with his M.D. until he completed a language course required for his Ph.D. degree. Doe considered this move unfair: he could have taken the course during the preceding academic year but had declined to do so based on his agreement with

Slauch to defer working on his Ph.D. until he had completed his M.D.  In January 2004, Doe met

with Karen Carney, the dean of the Graduate College, to complain about Slauch's new demands.

Carney believed that Doe had a legitimate complaint and encouraged him to resolve the issue

informally.  As Carney had advised, Doe met with Slauch in February 2004 to discuss his

concerns about having to complete his language requirement at that time.  According to Doe,

Slauch became angry, stating "[y]ou're the one who's being a stickler for the rules!"  *Id*. ¶¶ 37,

39, 41-42.

Doe's problems escalated after the meeting with Slauch.  On February 23, 2004, two of

Doe's fellow students, Kim Schutterle and Leigh Saint-Louis, spoke to Bloom and portrayed Doe

as a "violent, dangerous, and criminal person who posed a threat to patients, faculty, and

classmates."  *Id*. ¶ 54.  Bloom and Saluch convened a meeting on February 23 with the Office of

Student Affairs, the University Student Counseling Center, the Office of Student Discipline, and

the University Police Department to discuss Schutterle and Saint-Louis's statements.  No one

from the University informed Doe about these meetings or the accusations against him.  On

March 4, Bloom sent a letter to the faculty for Doe's clinical courses, informing them that others

had expressed concerns about Doe's "inappropriate and unprofessional behavior" and requesting

additional information about any problems they had experienced with Doe.  According to Doe,

Bloom and Slauch met with several officials at the University in an effort to terminate Doe from

the Medical Scholars program by using the statements made by Schutterle and St-Louis.  *Id*. ¶¶

44-53.  Doe states that he did not learn of the statements Schutterle and Saint-Louis were making

about him until September 2004.

In May 2004, Doe completed his final examinations and returned home believing that he

had done well enough to enter his first round of clinical rotations. Doe returned home because his grandmother was quite ill. While there, he learned that his grade in Clinical Laboratory Sciences required remediation. Doe sought assistance from his instructors in remediating his grade, and he also requested special accommodations due to his grandmother's illness. During this time, Doe states that Bloom never informed him of his right to petition for an exemption from the Introduction to Clinical Clerkships course, a course that is normally a prerequisite for beginning clinical rotations. *Id*. ¶ 61.

On June 21, 2004, Doe took a remediation examination for Clinical Laboratory Sciences. He scored fifty-six percent, which was four percentage points below the passing grade of sixty percent. At this point, the College of Medicine began a review of Doe's academic status. Three committees comprised of faculty, administrators, staff, and students of the College of Medicine reviewed Doe's progress. The Student Progress and Promotions Committee (SPPC) conducted the initial level of review, the Executive Committee (EXCOM) conducted the second level of review, and the College Committee on Student Promotions (CCSP) conducted the final level of review. *Id*. ¶¶ 63-64.

According to Doe, Bloom and Slauch wrongfully submitted certain information about him to the committees. Specifically, Doe states that they wrongfully informed the committees about the time accommodations made for his learning disability; they provided false and misleading information about his academic progress; and they shared statements from Schuetterle and Saint-Louis indicating that he was an unprofessional person. According to Doe, Bloom and Slauch, who were ex-officio members of the SPPC, EXCOM, and CCSP, attended the meetings of these committees and convinced them to terminate Doe from the College of

Medicine and the Medical Scholars program. *Id.* ¶¶ 65-79.

During the committees' initial set of meetings, the SPPC and the EXCOM recommended terminating Doe. The exact basis for their recommendations is unclear. Doe, however, noticed that Bloom and Slauch incorrectly informed the committees that Doe did not meet the requirements to retake the remediation exam in Clinical Laboratory Sciences. According to the College of Medicine's policies, a student is entitled to retake a remediation examination if his total grade percentage for all second-year courses is at least six percent higher than the weighted overall percentage passing levels for the second-year courses. Doe recognized that Bloom and Slauch had misadvised the committees, and as a result, his case was sent back from the EXCOM to the SPPC. *Id.* ¶¶ 81-86.

Following the remand to the SPPC, Doe contends that Bloom and Slauch reemphasized the statements that Doe was a "violent, dangerous, and criminal individual" who needed to be terminated from the medical school. In August 2004, the SPPC and EXCOM recommended Doe's dismissal from the program for a second time. Because of further mistakes in these proceedings, however, Doe's case was sent back to the SPPC and the EXCOM for a third reconsideration. Doe's complaint does not explain the nature of these mistakes. *Id.* ¶¶ 86-89.

On August 27, 2004, Doe made a request for all information the University had concerning him. He received the contents of his file but suspected that it was missing additional information. He therefore made another request for information. Bloom stated that she had provided him with the contents of his file, and if he suspected that the University possessed additional information about him, he could file a Freedom of Information Act request. Doe made a third request for information and stated that he would consider the withholding of any

information a violation of his due process rights. In response, Doe received documents that included a series of e-mails from Schutterle and Saint-Louis to Bloom and the University Police. Bloom stated that she had inadvertently failed to provide this information earlier. It appears that this was the first time that Doe had learned of the accusations Schutterle and Saint-Louis made about him and the subsequent investigations conducted by University officials. *Id.* ¶¶ 87-93.

On September 22, 2004, Doe requested information about the test scores and overall grades of students in the Clinical Laboratory Studies course. He suspected that other students who had failed the examination had been given extra accommodations denied to him. Doe learned that two students were awarded an extra percentage point on their examination scores, which enabled them to pass the course. Doe alleges that he was not given this accommodation, which would have increased his examination score enough to enable him to retake the examination. It is unclear from Doe's complaint whether the other students were able to pass the course because the extra points placed them into the passing range or because the extra points enabled them to retake the examination successfully. *Id.* ¶¶ 95-97.

In December 2004, the SPPC and EXCOM recommended Doe's dismissal for the third time. At least one week before the meetings of these committees, Doe provided information disputing the statements made by Schutterle and Saint-Louis. Doe ultimately appealed the decisions of the SPPC and the EXCOM to the CCSP. Doe exercised his right to appear in person before the CCSP and provided the committee with 107 pages of supporting documents. Between December 2004 and January 2005, Doe maintains, Bloom and Slauch called CCSP members individually to advocate for Doe's dismissal. *Id.* ¶¶ 98-105.

The CCSP ultimately decided to dismiss Doe from the College of Medicine and the

Medical Scholars Program. In a letter dated January 24, 2005, the committee stated, "As you had pointed out in your appeal, the Promotions Guidelines do have a provision that allows students who have failed a single course following the make-up opportunity by more than three points to petition the site committee for a third attempt, provided the overall performance is at least six points (two standard errors of measurement) above the cumulative pass level. Although your score and performance fell within those parameters, the CCSP agreed that your overall academic performance in the College of Medicine has been weak from the onset." *Id*. ¶ 106.

On February 26, 2005, Doe filed formal grievances with eleven University offices. On May 11, 2005, Lilye Hart, dean of the College of Medicine, held an initial meeting with Doe during which she stated that she had not investigated his complaints and asked Doe whether he would be satisfied with reinstatement in the College of Medicine alone. Doe told her that this would be unsatisfactory, as he had been terminated from the Medical Scholars program only because he was dismissed from the College of Medicine. Doe claims that Hart wanted to exclude him from the Medical Scholars Program because M.D./Ph.D. students customarily receive a fee waiver and a stipend, whereas most M.D. students pay full tuition and fees. *Id*. ¶¶ 107-111.

Over three months after Doe filed his grievances, Hart informed Doe on August 11, 2005 that she had investigated his grievances and determined that he had been dismissed for academic reasons alone. Hart stated that "[t]he CCSP policy allows a student with a single course failure to petition the Student Progress Committee for a third attempt if the student's overall performance is within stated criteria. Your petition was denied. Therefore, I find that the applicable grading and review policies were followed, and, as such, you were treated fairly." *Id*.

¶ 114.

Doe subsequently filed this lawsuit against the defendants, who are the Board of Trustees, officials, and students of the University of Illinois.  He alleges that at the relevant times, Bradford Schwartz was the regional dean and Jennifer Bloom was the associate dean of students for the Urbana campus of the College of Medicine; James Saluch was the director of the Medical Scholars program of the University;  Dixie Whitt was the chairperson of the SPPC and a voting member of the CCSP; Douglas Rhone was the acting chairperson and a member of the CCSP; Richard Gumport was the acting chairperson and a member of the EXCOM; William Marshall was an affiliate of the College of Medicine; Kim Schuetterle and Leigh Saint-Louis were students in the College of Medicine; and Uma Sekar was a preceptor for the College of Medicine.  Compl. ¶¶ 6-16.

## Discussion

When considering a motion to dismiss for failure to state a claim, a "court must accept all well-pleaded facts alleged in the complaint as true and must draw all reasonable inferences in favor of the [plaintiff]."  *Phelan v. City of Chicago*, 347 F.3d 679, 681 (7th Cir. 2003). Dismissal is warranted only if "the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Id.*  With this standard in mind, we address each of Doe's claims in turn.

## I.     Federal law claims

### a.     Count 1:  Americans with Disabilities Act

Doe alleges that the University, Bloom, Slauch, Schwartz, Whitt, Gumport, and Rhone violated the ADA by discriminating against him because of his learning disabilities and by failing

9

to accommodate those disabilities. The defendants respond that Doe's claim is barred to the extent he is suing the University for any form of relief and to the extent he is suing the individual defendants for monetary damages.

First, the defendants argue that the University and its officials sued in their official capacities are entitled to sovereign immunity under the Eleventh Amendment. The Eleventh Amendment generally bars claims against a state or state officials sued in their official capacities. *Wynn v. Southward*, 251 F.3d 588, 592 (7th Cir. 2001). The Eleventh Amendment does not apply, however, if Congress has validly abrogated the immunity pursuant to section five of the Fourteenth Amendment; if the state has clearly waived its immunity; or if the plaintiff is suing state officials for prospective relief for an ongoing federal constitutional or statutory violation. *See Sonnleitner v. York*, 304 F.3d 704, 717 (7th Cir. 2002).

Initially, Doe argues that the Congress validly abrogated state sovereign immunity in enacting Title II of the ADA, which prohibits disability-based discrimination by public entities. 42 U.S.C. §§ 12131-12165. Pursuant to section five of the Fourteenth Amendment, Congress may enact legislation abrogating state sovereign immunity to remedy and prevent violations of that Amendment. *Tennessee v. Lane*, 541 U.S. 509, 518 (2004). This power, however, is not unlimited. *Id.* at 520. Rather, "[s]ection [five] legislation is valid if it exhibits 'a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.'" *Id.* (quoting *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997)).

In *Lane*, the plaintiffs, who were paraplegic, contended that Tennessee violated a provision of Title II of the ADA by denying them access to local courthouses. The state invoked

sovereign immunity, arguing that Title II was not a valid abrogation of the Eleventh Amendment.

In conducting the congruence and proportionality inquiry, the Court examined what rights

Congress sought to enforce in enacting Title II; whether there was a history of unconstitutional

discrimination; and whether the statute was an appropriate response to this discrimination. At

the outset, the Court noted that Title II sought to enforce a variety of constitutional guarantees:  it

sought to enforce the prohibition on irrational discrimination against individuals with disabilities

and protect the substantive rights of the disabled, including the fundamental right of access to the

courts. *Id.* at 522-23.  Next, the Court found that Congress had documented a pattern of

discrimination against the disabled in public services, particularly regarding the physical

accessibility of public facilities. *Id.* at 524-29.  Finally, the Court held that Title II was a

congruent and proportional response to this discrimination, given that a fundamental right was at

stake and that Title II imposed remedial requirements that neither threatened the fundamental

nature of state programs or the state's financial health. *Id.* at 530-34.  The Court therefore held

that Title II constituted a valid abrogation of the Eleventh Amendment for the purposes of

remedying past violations and preventing future violations of disabled individuals' rights of

access to the courts. *Id.* at 534-35.

According to the defendants, the holding in *Lane* hinged on the fact that the plaintiffs had

suffered violations of a fundamental constitutional right.  When a fundamental constitutional

right is not implicated, the defendants contend, Congressional abrogation of the Eleventh

Amendment pursuant to section five of the Fourteenth Amendment fails the congruence and

proportionality test.  In making this argument, the defendants cite two district court cases that

have rejected the proposition that Title II, as applied to post-secondary educational institutions,

represents a valid abrogation of the Eleventh Amendment. *See Press v. State Univ. of N.Y.*, 388 F. Supp. 2d 127, 134 (E.D.N.Y. 2005); *Johnson v. S. Conn. State Univ.*, No. CIVA3:02-CV-2065, 2004 WL 2377225, at *3-4 (D. Conn. Sept. 30, 2004).[1]

In *Press*, an undergraduate student claimed that the university had violated the ADA by discriminating against him based on the fact that he had dyslexia and dysgraphia. The court dismissed the case. *Press*, 388 F. Supp. 2d at 129. The court applied the proportionality and congruence test, carefully comparing the facts before it to those in *Lane*. The court recognized the importance of education and the history of discrimination against the disabled in obtaining an education but nonetheless held that Title II was not a congruent and proportionate response to disability-based discrimination in the post-secondary education context. *Id.* at 133-34. Specifically, the court concluded that because the disabled are not a suspect class and education is not a fundamental right, Congress could not use its powers under section five of the Fourteenth Amendment to abrogate state sovereign immunity to protect the rights of disabled students at state colleges and universities. *Id.* at 134-35.

The Fourth and Eleventh Circuits have addressed the same issue and have reached the opposite conclusion from the district court in *Press*. *Constantine v. Rectors & Visitors of George*

_____

[1] Defendants also cite a pre-*Lane* decision by the Seventh Circuit indicating that Title II does not constitute a valid abrogation of state sovereign immunity to the extent "it forbids a state to take account of disabilities that are rationally related to permissible objects of public action" and "requires accommodation of disabilities (rather than simply requiring the state to disregard disabilities)". *See Walker v. Snyder*, 213 F.3d 344, 346-47 (7th Cir. 2000), *abrogated on other grounds by*, *Bruggeman ex rel. Bruggeman v. Blagojevich*, 324 F.3d 906, 913-14 (7th Cir. 2003). Though it is unclear whether *Walker*, which addressed disability discrimination against prison inmates, survives *Lane*, the decision provides an indication of the Seventh Circuit's skepticism regarding the scope of Title II.

*Mason Univ.*, 411 F.3d 474 (4th Cir. 2005); *Assoc. for Disabled Americans v. Fla. Int'l Univ.*, 405 F.3d 954 (11th Cir. 2005). In both cases, students claimed that their universities violated Title II by failing to accommodate their disabilities. *Constantine*, 411 F.3d at 478-79, *Assoc. For Disabled Americans*, 405 F.3d at 956. Like the district courts that have addressed this issue, the Fourth and Eleventh Circuits recognized that the disabled are not a suspect class and that education is not a fundamental right. Nonetheless, emphasizing the particular importance of education in our society, they concluded that Title II was a congruent and proportional response to discrimination against the disabled in education. First, the courts concluded that the anti-discrimination and accommodation provisions of Title II were congruent with the goal of preventing and remedying irrational discrimination against the disabled in post-secondary education. *Constantine*, 411 F.3d at 488-89, *Assoc. For Disabled Americans*, 405 F.3d at 958-59. Second, the courts concluded that the relevant provisions of Title II were proportionate given they required the states to make only reasonable accommodations for students with disabilities that neither changed the fundamental nature of state programs nor imposed burdensome implementation costs. *Constantine*, 411 F.3d at 489-90, *Assoc. For Disabled Americans*, 405 F.3d at 959.

The Court finds itself in respectful disagreement with the Fourth and Eleventh Circuits. Title II imposes a number of burdens on all public entities, including the state university that is a defendant in this case. These entities must provide reasonable accommodations for recipients of services with disabilities, 28 C.F.R. § 35.130(b)(7), ensure their existing facilities, when viewed in their entirety, are accessible to people with disabilities, 28 C.F.R. § 35.150, and ensure that any new or renovated facilities are accessible to people with disabilities. 28 C.F.R. § 35.151.

13

There are exceptions to Title II's mandates: public entities need not make fundamental alterations to their programs, 28 C.F.R. § 35.130(b)(7), or incur undue financial burdens in ensuring that their facilities are accessible to people with disabilities. 28 C.F.R. § 35.150(3). There is no question, however, that these requirements, along with the threat of monetary damages if the entities fail to meet them, impose a significant burden on the states. In *Lane*, the Supreme Court determined that Congress, pursuant to section five of the Fourteenth Amendment, could impose these obligations on the states with respect to access to courthouse facilities because access to the courts is a fundamental constitutional right. The difference in this case is that education, despite its undoubted importance, is not considered by the Supreme Court to be a fundamental constitutional right. *See San Antonio Independent Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35-37 (1973). For these reasons, the Court concludes that Title II, as applied to the post-graduate state university program at issue in this case, exceeds Congress's power under section five. *See Lane,* 541 U.S. at 530-35; *see also Walker*, 213 F.3d at 346-47 (finding that Title II failed to abrogate the Eleventh Amendment to the extent it required states to accommodate rather than disregard disabilities and forbade states from "tak[ing] account of disabilities that are rationally permissible objects of public action.").

Doe contends that regardless of whether Title II validly abrogated the Eleventh Amendment, Illinois has consented to suits in federal court for violations of the ADA. Specifically, Doe cites 745 ILCS 5/1.5, a statute in which Illinois partially waived sovereign immunity with regard to suits under several civil rights statutes, including the ADA. Defendants correctly point out, however, that Illinois waived its immunity only with regard to suits by "an employee, former employee, or prospective employee of the State" for violations of the ADA "if

committed by an employer covered by that Act." *See* 745 ILCS 5/1.5. Doe attempts to resuscitate his argument by contending that he was a "former employee" of the University. Pl. Resp. ¶ 6-8; Compl. ¶ 125. Doe's allegations of ADA violations, however, relate only to his status as a student, not his status as an employee; there is no indication that Doe was employed as a teaching assistant during the time period relevant to his ADA claims. Compl. ¶¶ 121-200. For these reasons, the Court dismisses Doe's ADA claim against the University.[2]

Doe has also sued the individual defendants for money damages in their official and individual capacities. Defendants contend that Doe's claim is barred under both theories. The Court agrees. To the extent Doe is suing the individual defendants in their official capacities, his claim is barred because it amounts to a suit against the state which, as discussed above, is barred by the Eleventh Amendment. *See Brown v. Budz*, 398 F.3d 904, 918 (7th Cir. 2005). To the extent Doe is suing the individual defendants in their individual capacities, his claim is barred because the ADA only allows institutions, not individuals, to be sued for monetary damages. *See Walker*, 213 F.3d at 346; *Sallenger v. City of Springfield*, No. 03-3093, 2005 WL 2001502, at *29 (C.D. Ill. Aug. 4, 2005).

Doe also seeks injunctive relief against the individual defendants in their official

---

[2] It is at least conceivable that Doe may be able to advance a claim against the University under section 504 of the Rehabilitation Act. 29 U.S.C. § 704(a). Because Congress enacted that statute pursuant to the Constitution's Spending Clause, it could and did require states to waive their Eleventh Amendment immunity as a condition of receiving federal financial assistance. *See* 42 U.S.C. § 2000d-7(a)(1). As a result, the Eleventh Amendment does not immunize the states from lawsuits under the Rehabilitation Act. *See Stanley v. Litscher*, 213 F.3d 340, 344 (7th Cir. 2000). Because, however, Doe has not alleged that the University receives federal financial assistance for the College of Medicine, the Court cannot assess at this juncture whether he can assert a Rehabilitation Act claim in this case.

capacities, including reinstatement to the College of Medicine and the Medical Scholars

Program, transfer to the College of Medicine's Chicago campus, an opportunity to retake his

Clinical Laboratory Studies course, and a prohibition on future violations of his rights under the

ADA. Compl. pp. 139-40. Under the rule announced in *Ex Parte Young*, 209 U.S. 123 (1908),

plaintiffs may sue state officials in their official capacities for prospective relief to enjoin

ongoing violations of their federal rights, notwithstanding the state's Eleventh Amendment

immunity. *See, e.g., Bruggeman*, 324 F.3d at 912. Doe states that he was terminated because of

his disability, that he continues to suffer a violation of the ADA so long as his dismissal

continues, and that he seeks reinstatement and related injunctive relief to cure this violation.

In *Carten v. Kent State Univ.*, 282 F.3d 391, 395-97 (6th Cir. 2002), the Sixth Circuit

held that a dismissed student could bring a suit under *Ex Parte Young* for reinstatement after he

was expelled in violation of the ADA. The court stated that "claims for reinstatement state a

violation that continues during the period the plaintiff is excluded from the benefits to which he

is entitled." *See id.* at 396 (citing *Elliott v. Hinds*, 786 F.2d 298, 301 (7th Cir. 1985)). The

Seventh Circuit recently held that when a plaintiff claims that he has been dismissed or demoted

in violation of his procedural due process rights, he has not alleged an ongoing violation.

*Sonnleitner v. York*, 304 F.3d 704, 718 (7th Cir. 2002). Specifically, the court concluded that

"the violation was not the demotion as such, but, instead, the fact that the demotion occurred

without an adequate opportunity to be heard." *Id.* The court therefore determined that the

plaintiff could not use his demotion to establish an ongoing violation of his procedural due

process rights. *Id.* The Seventh Circuit has, however, continued to indicate that when an

individual's termination or dismissal directly violates a federal constitutional or statutory

guarantee, he may maintain a suit for reinstatement. *Levenstein v. Salafsky*, 414 F.3d 767, 772 (7th Cir. 2005); *Hernandez v. O'Malley*, 98 F.3d 293, 297 (7th Cir. 1996); *Kashani v. Purdue Univ.*, 813 F.2d 843, 848 (7th Cir. 1987). The Court therefore adopts the reasoning of the Sixth Circuit in *Carten*, concluding that when a student like Doe alleges that he was dismissed in violation of the ADA, he can, consistent with the Eleventh Amendment, bring a claim for reinstatement against the responsible official under *Ex Parte Young.*

    **b.    Count 6: RICO**

Doe alleges that the University, Bloom, and Slauch have violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964, by engaging in acts violative of 18 U.S.C. § 1512, which prohibits the use of intimidation or threats to interfere with an official proceeding. The defendants argue that this claim is barred as to the University on sovereign immunity grounds and as to the individual defendants for failure to state a claim. The Court agrees.

Doe claims that under the Illinois Local Governmental and Governmental Employees Tort Immunity Act, Illinois has waived its own immunity and the immunity of its employees for willful and wanton conduct in executing or enforcing any law. 745 ILCS 10/1-210; 745 ILCS 10/2-202; Pl. Resp. ¶¶ 9-11. As defendants correctly point out, this statute allows suits against certain governmental employees under limited circumstances; it does not represent a waiver of the state's sovereign immunity. The University is therefore immune from suit under RICO.

Furthermore, even if Doe were able to show that Bloom and Slauch were covered by the Tort Immunity Act's waiver of immunity, he has not stated a claim against them under RICO.

Doe argues that because the defendants interfered with state proceedings that led to the instant official federal proceeding, they violated section 1512, a RICO predicate offense.  *See* 18 U.S.C. § 1512; Pl. Resp. ¶¶ 12-13.  Doe misreads section 1512.  State proceedings are not federal proceedings within the meaning of section 1512 simply because they ultimately lead to a federal lawsuit.  *See McKinney v. Illinois*, 720 F. Supp. 706, 708 (N.D. Ill. 1989).  For these reasons, the Court dismisses Doe's RICO claim.

### c. Counts 7-9: 42 U.S.C. § 1983

Doe contends that the University and the individual defendants[3] have violated 42 U.S.C. § 1983 by denying him his federal constitutional rights to substantive and procedural due process (Count 7), equal protection (Count 8), and privacy (Count 9).  To establish a violation of section 1983, a plaintiff must show that the defendant deprived him of his federal rights while acting under the color of state law .  42 U.S.C. § 1983.

The Court dismisses Doe's claims for monetary damages against the University and its officials in their official capacity because the state is not a "person" under section 1983.  *See Will v. Mich. Dept. of State Police*, 491 U.S. 58 (1989); *Joseph v. Bd. Of Regents of the Univ. of Wis. Sys.*, 432 F.3d 746, 748-49 (7th Cir. 2005).   The Court next examines whether Doe has stated claims against other individual defendants sued in their individual capacities for money damages.

### 1. Count 7: Due process

Doe contends that the defendants violated both his substantive and procedural due

---

[3]  Doe has sued Bloom, Slauch, Schwartz, Whitt, Gumport, and Rhone in their official and individual capacities under Counts 7-9.  Doe has sued Marshall and Sekar, who are not parties to this motion to dismiss, in their official and individual capacities under Count 9 alone.

process rights. The Court addresses his substantive due process claim first. The defendants contend that because Doe has no constitutional right to a post-secondary education, he has failed to allege a violation of his substantive due process rights. The Court agrees. Substantive due process principles protect individuals from arbitrary deprivation of their fundamental rights and recognized property interests. *See Lee v. City of Chicago*, 330 F.3d 456, 467 (7th Cir. 2003). Post-secondary education, however, is considered neither a fundamental right nor a recognized property interest. *See Galdikas v. Fagan*, 342 F.3d 684, 688-91 (7th Cir. 2003), *abrogated on other grounds by Spiegla v. Hull*, 371 F.3d 928, 941-42 (7th Cir. 2004). Doe has therefore failed to state a claim to the extent Count 7 is based on an alleged violation of his substantive due process rights.

Doe also maintains that the defendants violated his right to procedural due process. Specifically, Doe alleges that the defendants violated his procedural due process rights during the proceedings that led to his dismissal from the College of Medicine and the Medical Scholars Program. We first examine whether Doe alleges that he was deprived of an interest protected by the Due Process Clause. *Pugel v. Bd. of Trustees of the Univ. of Ill.*, 378 F.3d 659, 662 (7th Cir. 2004). Doe contends that he had both property and liberty interests in his education. As discussed above, Doe had no property interest in obtaining a post-secondary education. *See Galdikas*, 342 F.3d at 688-91.

Courts have recognized that an individual has a liberty interest in pursuing the occupation of his choice. *See Fenje v. Feld*, 398 F.3d 620, 627 (7th Cir. 2005). Specifically, an employee has a liberty interest in ensuring that his employer does not defame him in relation to his dismissal such that he can no longer obtain a job in his chosen field. *See Strasburger v. Bd. of*

*Educ., Hardin County Cmty. Unit Sch. Dist. No. 1*, 143 F.3d 351, 356 (7th Cir. 1998). To establish that he had a liberty interest triggering procedural due process requirements, a plaintiff must show "'(1) he was stigmatized by the defendant's conduct, (2) the stigmatizing information was publicly disclosed, and (3) he suffered a tangible loss of other employment opportunities as a result of public disclosure.'" *Id.* (quoting *Johnson v. Martin*, 943 F.2d 15, 16 (7th Cir. 1991)). Specifically, a plaintiff must show that the defendant publicly made defamatory statements about him that led to the tangible loss of employment opportunities. *Id.* Doe's complaint, however, does not even hint that the defendants discussed his dismissal outside the University. Though Doe's dismissal from the University may hamper his chances of completing medical school and becoming a physician, that by itself does not implicate a protected liberty interest. *See Hedrich v. Bd. of Regents of the Univ. of Wis. Sys.*, 274 F.3d 1174, 1184 (7th Cir. 2001). Doe has failed to allege that he was deprived of a liberty interest that brought procedural due process requirements into play. The Court therefore concludes that Doe has failed to state a claim to the extent that Count 7 is based on a violation of his procedural due process rights.

### 2. Count 8: Equal protection

Doe also alleges that the individual defendants violated his constitutional right to equal protection. An equal protection violation most commonly involves discrimination based on membership in a suspect class or denial of a fundamental right. *See Martin v. Schwano-Gresham Sch. Dist.*, 295 F.3d 701, 712 (7th Cir. 2002). In this case, neither of these factors is present: individuals with disabilities are neither a suspect nor a quasi-suspect class, *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 442 (1985), and education is not a fundamental right. *See Rodriguez*, 411 U.S. at 35-37. That does not mean, however, that Doe, as a person with a

20

disability, is unprotected by the Equal Protection Clause. Government-imposed distinctions between those who have disabilities and those who do not "must be rationally related to a legitimate governmental purpose." *City of Cleburne*, 473 U.S. at 446. Doe alleges that the defendants intentionally discriminated against him because of his learning disabilities, *see* Compl. ¶ 315, and that allegation is sufficient to state a claim for denial of equal protection. Whether he was in fact treated in a discriminatory fashion, and whether any such discrimination passes the "rational basis" standard, are issues that the Court cannot appropriately determine at this stage of the case.

Doe has also adequately alleged a "class of one" equal protection claim – that is, a claim that he was intentionally singled out for differential treatment from others similarly situated without a rational basis. *See Martin*, 295 F.3d at 712 (citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). Defendants argue that Doe has failed to state a "class of one" claim. Initially, defendants argue that he has failed to identify any similarly situated individuals who were treated better than he was. A plaintiff is not required, however, to specifically identify similarly situated individuals in his complaint. *See Levenstein v. Salafsky*, 164 F.3d 345, 352-53 (7th Cir. 1998). Defendants also contend that Doe has failed to allege that there was no rational basis for his treatment. *See Lauth v. McCollum*, 424 F.3d 631, 634 (7th Cir. 2005). As discussed above, however, Doe has clearly alleged that he was dismissed by the defendants based on his disabilities and his requests for reasonable accommodations. For these reasons, Count 8 states a claim to the extent Doe is suing the individual defendants for money damages. *See Levenstein*, 164 F.3d at 345. The Court also concludes that because Doe has alleged that he was dismissed by defendants because he was disabled and demanded accommodations, he has stated a claim for

injunctive relief, such as reinstatement. *See Kashani*, 813 F.2d at 848.

Defendants contend that they are entitled to qualified immunity. Courts do not ordinarily dismiss a complaint under Rule 12(b)(6) on qualified immunity grounds because entitlement to immunity typically depends on the facts of the particular case. *Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001). Defendants nonetheless contend that dismissal is appropriate in this case because the defendants did not violate a clearly established right and are therefore legally entitled to qualified immunity. Their argument in this regard, however, is largely confined to Doe's "class of one" equal protection theory, which is not the exclusive basis for his equal protection claim. *See* Def. Resp. at 16. With regard to Doe's claim of irrational discrimination based on the fact that he has a disability, the law has been clearly established since at least *City of Cleburne,* and even before that, that irrational discrimination based on a person's disability violates the Equal Protection Clause. Defendants' argument that qualified immunity applies is based on their own, narrow, characterization of Doe's allegations, *see id.,* contrary to the Supreme Court's admonition that in determining the immunity issue prior to trial, the facts must be "taken in the light most favorable to the party asserting the injury." *Saucier v. Katz,* 533 U.S. 194, 201 (2001).

With respect to Doe's "class of one" claim, the defendants rely on *Lununi v. Grayeb,* 395 F.3d 761 (7th Cir. 2005), in which the Seventh Circuit directed the entry of summary judgment on qualified immunity grounds on a class of one claim, concluding that the right at issue was not clearly established because no such claim had succeeded in similar circumstances, and the defendants' conduct was not an obvious violation of federal law. *Id.* at 769. This case, unlike *Lununi,* has not reached the summary judgment stage, and thus it is not altogether clear that the

analysis the court used in that case is appropriately applied at the must earlier procedural stage we face in the present case.  More importantly, however, defendants' argument in favor of qualified immunity on the class of one claim is cursory and undeveloped, making it difficult to assess.  *See* Defs' Mem. at 16.  The Court will require further briefing on this issue in order to decide it properly:  defendants are directed to submit a memorandum of no more than five pages within seven days of this order, and plaintiff is directed to submit a memorandum of no more than five pages within seven days thereafter.  Both memoranda are to be focused exclusively on the issue of qualified immunity on Doe's class of one equal protection claim.  That aside, however, defendants' argument in favor of immunity on Doe's disability discrimination equal protection theory is rejected, for defendants have failed to address the issue in the way *Saucier* requires.

### 3.      Count 9: Right to Privacy

Doe argues that defendants violated his constitutional and statutory privacy rights by unlawfully disclosing his medical records.  The Court agrees with the defendants that Doe has failed to state a claim in this regard.  First, Doe contends that defendants have violated the federal Health Insurance Portability and Accountability Act.  Every court to have considered the issue, however, has concluded that HIPAA does not authorize a private right of action.  *See, e.g., Runkle v. Gonzales*, 391 F. Supp. 2d 210, 237 (D.D.C. 2005); *Dominick J. V. Wyoming Valley West High Sch.*, 362 F. Supp. 2d 560, 572 (M.D. Pa. 2005).  The Court agrees with these decisions; HIPAA provides civil and criminal penalties for improper disclosures of medical information, but it does not create a private cause of action, leaving enforcement to the Department of Health and Human Services alone.  Second, Doe argues that defendants have

violated the state Medical Patient Rights Act and Mental Health and Developmental Disabilities Confidentiality Act. Even if this were true, violations of state law do not give rise to a claim under section 1983. *See Pesce v. J. Sterling Morton High Sch.*, 830 F.2d 789, 795 (7th Cir.1987).

Finally, Doe states that the defendants have violated his federal constitutional right to privacy. *See id.* at 795. Even assuming that the records at issue here – which state that Doe had learning disabilities and received time accommodations during examinations – might ordinarily constitute confidential medical information in which Doe had a privacy right, we fail to see how their disclosure would implicate federal constitutional protections. In any event, the records did not constitute confidential medical information under the circumstances alleged by Doe. To the contrary, Doe had to know that this information would be disclosed to others within the University to ensure that he received accommodations for his disabilities.[4] *See Schaill v. Tippecanoe County Sch. Corp.*, 864 F.2d 1309, 1319 (7th Cir. 1988) (finding it implausible that student athletes, who knew of the pervasiveness of drug testing in sports, would have an expectation of privacy with respect to urine tests). For these reasons, the Court concludes that Doe has failed to state a claim for the violation of his constitutional right to privacy.

### d.        Counts 10-15:  Sections 1985 and 1986

Doe states that defendants violated 42 U.S.C. § 1985(3) by conspiring to deprive him of his rights to due process (Count 10), equal protection (Count 11), and privacy (Count 12). *See* 42 U.S.C. § 1985. A claim under section 1985(3) requires an allegation of class-based animus. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267-68 (1993). The Seventh Circuit

---

[4] Doe does not allege that this information was disclosed outside the University.

has held that disability-based animus does not constitute the type of animus required by section 1985(3). *See D'Amato v. Wis. Gas Co.*, 760 F.2d 1474, 1486-87 (7th Cir. 1985). The Court therefore dismisses Counts 10-12 for failure to state a claim.

Doe further contends that defendants violated 42 U.S.C. § 1986 by failing to prevent the alleged conspiracy to violate his due process, equal protection, and privacy rights. *See* 42 U.S.C. § 1986. Because Doe cannot succeed on the underlying conspiracy claims, we must also dismiss Counts 13-15 for failure to state a claim.

**II.    State law claims**

Doe has also asserted state law claims for defamation (Count 2), civil conspiracy (Count 3), invasion of privacy (Count 4), and negligence (Count 5). Defendants contend that these claims should be dismissed on the grounds of sovereign immunity and for failure to state a claim. Doe has made no effort to support these claims; he has not responded to any of defendants' arguments. The Court dismisses Doe's state claims for failure to state a claim.

**Conclusion**

For the reasons stated above, the Court grants the defendants' motion to dismiss in part and denies it in part (docket no. 27). The Court declines to dismiss the following claims: Count 1 (ADA and Rehabilitation Act) to the extent discussed in the body of this decision and Count 8 to the extent Doe is suing the individual defendants in their official capacities for injunctive relief and in their individual capacities for monetary relief. All remaining claims are dismissed for failure to state a claim. The case remains set for a status hearing on May 4, 2006 at 9:30 a.m.

MATTHEW F. KENNELLY
United States District Judge

Date: April 20, 2006

25